IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
───────────────────────────────────────────────────────────────

PHILLIP A. SVEUM,

                   Defendant-Appellant,        OPINION & ORDER

    v.

                                                                   13-cv-788-wmc

STOUGHTON LUMBER COMPANY,

                   Plaintiff-Appellee.
───────────────────────────────────────────────────────────────

     Appellant Phillip Sveum seeks review of the bankruptcy court's decision finding that his company's debt to Stoughton Lumber Company is excepted from personal discharge pursuant to 11 U.S.C. § 523(a)(4).[1] In essence, Sveum argues that the bankruptcy court erred in finding that he evinced the necessary state of mind to constitute defalcation by failing to insure that funds earmarked for a specific subcontractor in draw requests were set aside and paid over to the subcontractor.. The court concludes that the bankruptcy court may have erred in finding that Phillip had actual knowledge of his brother Peter Sveum's misappropriation of the draws to cover other company expenses, at least for the reasons articulated in open court. Further, while the bankruptcy court may have intended to find that Phillip was "willfully blind" to the risk of misappropriation resulting from his own failure to fulfill fiduciary duties, that is not stated in the opinion either. Therefore, the court will remand for further factual findings as to: (1) the basis for the bankruptcy court's finding that Phillip had actual knowledge draws were being misappropriated; and (2) whether the court intended to find, and if so, the reasons for finding, that Phillip acted with

---

[1] This court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a)(1).

"willful blindness" to his brother's misappropriation of finds drawn for the specific purpose of paying subcontractors like Stoughton Lumber.

FACTS[2]

Phillip Sveum and his brother Peter were officers and equal owners of Kegonsa Builders, Inc. ("KBI"), a Wisconsin corporation engaged in the construction of residential homes.[3] KBI was a longtime customer of Stoughton Lumber, which provided KBI with material for its home construction business. Peter Sveum served as President of KBI; Phillip served as Vice President. Phillip did not participate directly in KBI's day-to-day operations, although he had authority and control over KBI's funds and was generally consulted on major business issues.

Peter signed all construction draw requests, and Sveum Enterprises Controller Vicki Millard processed those requests. On receipt of a signed draw request for funds to cover work by subcontractors, including Stoughton Lumber, the lender would submit the requested funds to a title company, which would in turn deposit those funds in KBI's account at Park Bank. KBI did not segregate the construction draw funds, even when the requests showed that funds were earmarked for particular subcontractors. Instead, KBI deposited all funds in its Park Bank general account and used them to pay general operating expenses, payroll, overhead and other bills. Whenever KBI sold a home, Peter would also select the subcontractors and bills Millard was to pay with the proceeds.

---

[2] The following factual summary is taken from the bankruptcy court's findings and the trial record, when viewed in a light most favorable to appellee as the party who prevailed below.
[3] For ease of comprehension, the court refers to the Sveums by their first names throughout this opinion.

2

In the late 2000s, KBI began to struggle to pay its obligations to subcontractors, including Stoughton Lumber. On January 13, 2011, Stoughton Lumber brought suit against KBI in Dane County Circuit Court Case No. 2011-CV-220 for breach of contract; theft by contractor pursuant to Wis. Stat. § 779.02(5);[4] and theft by officer pursuant to Wis. Stat. § 779.02(5), seeking $507,421.18 in principal and $241,369.85 in contractual interest in building materials that KBI had purchased on credit for constructing the homes.

On June 2, 2011, Stoughton Lumber settled Case No. 2011-CV-220 (hereinafter "*Stoughton I*") with KBI, Phillip and Peter. Under the terms of the Settlement Agreement, KBI, Phillip and Peter agreed to pay $100,000 in cash immediately and signed a $550,000 promissory note ("Note"), secured by real estate owned by Sveum Investment Company, LLP. Phillip and Peter also executed personal guarantees. Pursuant to that agreement, *Stoughton I* was dismissed with prejudice.

On February 8, 2012, the first lien holder on the real estate that secured the Note initiated foreclosure proceedings. Under the *Stoughton* I settlement agreement, foreclosure on the collateral constituted default, so Stoughton Lumber accelerated the Note and sought payment in full, but received none.

---

[4] Wisconsin's theft by contractor statute reads, in relevant part: "The proceeds of any mortgage on land paid to any prime contractor or any subcontractor for improvements upon the mortgaged premises, and all moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor, services, materials, plans, and specifications used for the improvements, until all the claims have been paid[.] . . . The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or proportionally in cases of a deficiency, is theft by the prime contractor or subcontractor of moneys so misappropriated and is punishable under s. 943.20." Wis. Stat. § 779.02(5).

Consequently, on July 16, 2012, Stoughton Lumber filed a second lawsuit in Dane County Circuit Court, Case No. 12-CV-2812 (hereinafter "*Stoughton II*"), to collect the $568,263.10 due on the Note. On September 20, 2012, Stoughton filed materials and documentation with the Circuit Court showing that the debt on the Note had increased to $578,180.61 since the filing of the complaint, due to contractual interest owed. Stoughton moved for summary judgment against all three defendants, and the court set a hearing for October 4, 2012. That hearing never took place because, on October 2, 2012, Phillip and Peter, together with their spouses, filed for personal bankruptcy protection under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Western District of Wisconsin.

On their bankruptcy schedules, both Phillip and Peter listed a personal debt to Stoughton Lumber in the amount of $568,263.10. The proceedings in *Stoughton II* were stayed automatically as to Phillip and Peter, but on October 4, 2012, Stoughton Lumber obtained a default judgment against KBI in the amount of $589,638.10 ($578,180.61 in damages and $11,458.50 in contractual fees and collection costs owed).

On January 3, 2013, Stoughton Lumber filed adversary complaints in the Sveums' pending bankruptcy cases, contending that the debt from the *Stoughton I* settlement was nondischargeable as a debt arising from fraud or defalcation under 11 U.S.C. § 523(a)(4). The bankruptcy court denied summary judgment and consolidated the cases for trial. That trial was held on August 1, 2013.

At trial, Phillip testified that he had authority over KBI's accounts and that he knew, during the 2008 to 2011 period, that KBI was submitting draw requests to obtain funds from bank lenders to build homes. He also testified that he was not "tracking" whether KBI

4

kept funds from the construction draw requests in segregated funds to ensure they went to the specific contractors listed, depending on the accounting department to do what was required. Although Phillip received monthly statements on KBI, he claimed to spend no time going over accounts payable and relied on Peter to handle that.

At the same time, Phillip acknowledged knowing that the sale of a home resulted in cash to seller; understanding that all of KBI's expenses were paid out of its single bank account; relying on Peter to direct those payments wherever he might put them; and taking no steps to ensure that the subcontractors on any particular house were paid with the proceeds from the sale of that house. In addition, Phillip admitted to knowing that construction liens existed in Wisconsin, but denied knowing of the theft-by-contractor statute.[5]

At the trial's conclusion, the bankruptcy court immediately rendered its ruling from the bench, finding that: (1) a trust existed by operation of state law for each of KBI's 34 residential projects; (2) Phillip and Peter, as officers of KBI, were fiduciaries of that trust; and (3) Phillip and Peter violated their trust obligations to Stoughton Lumber and committed defalcation. In particular, the bankruptcy court found that (1) both Phillip and Peter knew KBI held funds received in payment for the projects for the benefit of its subcontractors and material suppliers, as that point was fundamental to construction law; and (2) Phillip and Peter's testimony that they did not know of their trust obligations was "disingenuous." The court went on to hold that:

---

[5] Phillip also testified that from 2008 to 2011, both Peter and he moved money into KBI from various other entities, and that he played a part in the decision *not* to pay any of it to Stoughton Lumber for the half-million it was then owed.

5

> [B]oth defendants testified to intentionally directing payments from draws to pay other than the subs and material suppliers who contributed to the improvement of the property securing the loan on which the draw was made. So both of them knowingly violated the trust. That is within the range of defalcation.

(Appellant's App. (dkt. #2-1) ECF 249.)

The bankruptcy court went on to find that Peter, who had made false representations on the seller's certificates that all subcontractors had been paid, had shown at least a willful disregard for his fiduciary duty and had probably committed outright fraud. As for Phillip, the court found that he "was aware that the sales were being made and that they could only be done by the fraud carried out by his brother and the violation of the trust by Kegonsa Builders." (*Id.* at ECF 250.) Thus, the bankruptcy court held that the debt to Stoughton Lumber was nondischargeable.

OPINION

The primary benefit of a Chapter 7 proceeding is to discharge debts in order to give debtors a fresh start. *In re O'Hearn,* 339 F.3d 559, 564 (7th Cir. 2003). "Congress nevertheless has decided that various considerations of public policy require that certain debts be excluded from the general principle of discharge." *Id.* One such provision excepts from discharge "any debt . . . for fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4).

To establish nondischargeability of a debt under § 523(a)(4), a plaintiff must bring an adversary proceeding and establish that: (1) a trust existed; (2) the debtor was a fiduciary of the trust; and (3) the debtor committed fraud or defalcation while acting as fiduciary. *In re Polus*, 455 B.R. 705, 708 (Bankr. W.D. Wis. 2011). Neither of the first two elements is

6

at issue: Phillip concedes that Wisconsin's theft-by-contractor statute, Wis. Stat. § 779.02(5), creates an express trust within the scope of § 523(a)(4) and that he was a fiduciary of that trust. The sole issue on appeal is whether the bankruptcy court correctly determined that he had committed fraud or defalcation while acting as the fiduciary of the trust.

Before 2013, courts disagreed on the state of mind necessary to establish defalcation, with some requiring only simple negligence and others (including the Seventh Circuit and the Bankruptcy Court for the Western District of Wisconsin) requiring a heightened standard of intent. *Compare, e.g.*, *Meyer v. Rigdon*, 36 F.3d 1375, 1384-85 (7th Cir. 1994) (holding that "a mere negligent breach of a fiduciary duty is *not* a defalcation under section 523(a)(11)") (emphasis in original), *and Starfire v. Dolata* (*In re Dolata*), Bankr. No. 08-23866-pp, Adversary No. 09-2056, 2010 WL 3860481, at *10 (Bankr. E.D. Wis. Oct. 1, 2010) ("more than mere negligence" required to demonstrate defalcation), *with Romes Design, Inc. v. Dinkins* (*In re Dinkins*), 327 B.R. 918. 923 (Bankr. E.D. Wis. 2005) ("No wrongful intent is required for a finding of nondischargeability.").

The Supreme Court recently resolved any dispute. In *Bullock v. Bankchampaign, N.A.*, 133 S. Ct. 1754 (2013), the Court held that defalcation "requires an intentional wrong" and further explained:

> We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty. That risk 'must be of such a nature and degree that, considering the

> nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation.'

*Id.* at 1759-60. To evaluate defalcation under the theft-by-contractor statute, then, "most courts look to the defendant's knowledge of the statute, the circumstances surrounding the violation, and the degree to which the defendant acted in his own self-interest, as relevant evidence from which inferences of culpability can be drawn." *Polus*, 455 B.R. at 708.

As a preliminary matter, the parties disagree about the appropriate standard of review. Generally, in an appeal from a bankruptcy court, questions of law are reviewed *de novo, In re Thirtyacre,* 36 F.3d 697, 700 (7th Cir. 1994), while questions of fact are reviewed for clear error only, Fed. R. Bankr. P. 8013. Appellant argues that *all* of the issues in this case should be reviewed *de novo* as questions of application of law to facts, while appellee contends that the standard of review is clear error.

To the extent that this appeal focuses on the bankruptcy court's determination of nondischargeability and the facts on which it relied, the court agrees with appellee. The Seventh Circuit has explicitly held "that a bankruptcy court's determination of dischargeability is subject to a clearly erroneous standard of review." *In re Bonnett*, 895 F.2d 1155, 1157 (7th Cir. 1989); *see also In re DeLong,* 323 B.R. 239, 246 (W.D. Wis. 2005) (reviewing bankruptcy court's determination of dischargeability for clear error). Under this standard, an appellate court should not overturn the bankruptcy court simply because the appellate court may have decided the case differently. *In re Morris*, 223 F.3d 548, 553 (7th Cir. 2000). Rather, a finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

conviction that a mistake has been committed." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)).

"Special deference must be accorded to credibility determinations, 'for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief of what is said.'" *Bonnett*, 895 F.2d at 1157 (quoting *Anderson,* 470 U.S. at 575). "Absent an abuse of discretion, an appellate court should not attempt to redetermine the credibility of witnesses." *Id.* (citing *In re Pearson Bros. Co.*, 787 F.2d 1157, 1162 (7th Cir. 1986)).

With this deferential standard in mind, the court turns to the bankruptcy court's determination of defalcation. The bankruptcy court found that both Phillip and Peter consciously disregarded a substantial, unjustifiable risk that their conduct would violate their fiduciary duties under the trust imposed by Wis. Stat. § 779.02(5). More particularly, the court found that: (1) Phillip knew that KBI held funds received in payment for the projects for the benefit of subcontractors and material suppliers; and (2) Phillip acknowledged intentionally directing payments from draws to pay other debts rather than the subcontractors for whom the money was being held in trust. The court also found that, while Peter was the one who signed seller's certificates representing that all subcontractors had been paid, Phillip was aware that sales were being made and knew that they could only have been carried out by means of Peter's fraud and KBI's violation of the trust.

Phillip's challenge is predicated primarily on his argument that he lacked *actual* knowledge of his brother's fraudulent conduct. In support, Phillip argues: (1) he was not involved in the day-to-day operations of KBI; (2) he never attended closings for any of the lot sales; (3) he never made any draw requests; and (4) he had every intention of satisfying

the debts to Stoughton Lumber. Further, Phillip argues, there is no evidence that *he* directed payments from draws to pay bills other than those of the subcontractors and suppliers who contributed to the properties' improvement, or that he knew of Peter's fraud in signing blank owner's affidavits. Thus, Phillip contends his conduct was at most negligent and cannot constitute defalcation.

As a starting point, the court sees no reversible error in the bankruptcy court's factual finding that Phillip knew of his shared obligation as a fiduciary to hold funds in trust for Stoughton Lumber. Phillip testified that he has a bachelor's degree in real estate and has been in the real estate business and construction industry for about 36 years. (Appellant's App. (dkt. #2-1) ECF 150-51.) Phillip further testified to having a general understanding of construction liens, and of spending more than 200 hours in continuing education to maintain his real estate broker's license. (*See id.* at ECF 187-88.) Finally, he testified that he knew KBI was submitting draw requests as it constructed homes. (*See id.* at ECF 168-69.) In light of Phillip's extensive experience in the industry and his knowledge that KBI was using funds from draw requests to construct homes, the court sees no abuse of discretion in the bankruptcy court's decision to reject as "disingenuous" Phillip's testimony that he somehow lacked knowledge of the theft-by-contractor statute and the accompanying fiduciary duties to subcontractors, particularly since part of that decision involves the court's evaluation of Phillip's credibility while testifying live before the bankruptcy court. (*See id.* at ECF 248-49.)

Admittedly more problematic is the bankruptcy court's finding that Phillip violated his fiduciary duties *intentionally* by directing funds held in trust for Stoughton Lumber to

pay other subcontractors and material suppliers. Tellingly, rather than defending the bankruptcy court's finding, Stoughton Lumber instead dismisses it in a brief to this court:

> Phillip also asks this Court to ignore the second half of the legal standard governing his behavior. "There is nothing in the record that supports the bankruptcy court's finding that Phillip intentionally directed payments from draws to pay parties other than subs and materials suppliers." Phillip's Brief at 14 (Dkt. 2). *Certainly not, because the bankruptcy court never made such a finding.*

(Appellee's Br. (dkt. #3) 15 (emphasis added).) This italicized denial is demonstratively wrong. The bankruptcy court specifically and expressly found both defendants "knowingly violated the trust." (Appellant's App. (dkt. #2-1) ECF 249.)

More troubling is the bankruptcy court's express reasons for finding that Phillip intentionally directed payments from draws to the wrong parties. First and foremost, the court stated "both defendants testified to intentionally directing payments from draws" to the wrong parties. *Id*. In fact, only one of the brothers, Peter, so testified. (Appellant's App. (dkt. #2-1) ECF 112.) Phillip not only denied directing how funds from any draw should be distributed, but even knowledge as to how Peter or the bookkeeper did so. (*See id.* at ECF 169-71.)

Nor does the court's opinion offer other evidence of Phillip's intent to defraud. Rather, Phillip repeatedly testified that: (1) Peter controlled the finances of KBI; and (2) he depended on Peter to handle KBI's accounts payable. KBI's former accounting manager, Vicki Lynn Millard, also testified that her instructions as to what payments to make from available funds came from Peter alone and that she never interacted with Phillip on those issues. Peter himself testified that he directed Millard what contractors to pay and that Phillip never told him not to pay Stoughton Lumber.

11

There is simply no direct or indirect evidence in the record to support the bankruptcy court's finding that *Phillip himself* knowingly or intentionally directed funds from any draw request away from Stoughton Lumber or other subcontractors named in a draw request in violation of his fiduciary duties. Nor does Stoughton Lumber point to any evidence in the record that Phillip knew anything about his brother's signing blank affidavits falsely averring to the homes being free from claims for unpaid work, which is the second and final finding on which the bankruptcy court's finding of defalcation was based. For example, the fact that Phillip undoubtedly knew KBI was selling homes during the time period in question may not necessarily mean he knew that Peter was also falsely signing affidavits of payments to subcontractors and suppliers in bulk, nor that all subcontractors on the individual house had not, in fact, been paid at the time of closing.

Moreover, while Stoughton Lumber counters that Phillip was "intimately involved" in financial decision-making for KBI, it can only point to his testimony that when Peter and he agreed to infuse KBI with new money from their other entities, they decided together not to pay Stoughton Lumber with that cash. But the records reflects that decision to add capital came *after* half a million dollars was already owed Stoughton Lumber, and in any event, it is wholly separate and apart from the decision not to set aside earmarked draws that would constitute defalcation, since newly-infused money is not subject to a trust, nor does the brothers' decision to invest it as they saw fit violate any fiduciary duty. *See Polus*, 455 B.R. at 708. In any event, Phillip's extraordinary agreement to infuse new cash to keep KBI afloat does not demonstrate his involvement in KBI's day-to-day operations.

One could feasibly argue that the bankruptcy court actually intended to find, albeit implicitly, that even if Phillip did not *know* his conduct was improper, he was at least

willfully blind to the substantial risk his breach of fiduciary duties of oversight represented to subcontractors given his knowledge that Peter had but one bank account and must have been putting funds from draws into that account unsegregated at a time when KBI was having serious cash flow problems. Indeed, in *Bullock*, the Supreme Court held that willful blindness, along with knowing misconduct, is subsumed within the general category of intent. *Bullock*, 133 S. Ct. at 1759.

There are at least three problems with upholding the bankruptcy court's judgment by intuiting its finding of Phillip's willful blindness. *First*, the bankruptcy court expressly relied on Phillip's supposed admission that he intentionally *directed payments to the wrong parties*. As discussed above, there is no record evidence that he had a role in directing payments at all, much less an admission by Phillip to that effect as the court's oral opinion states. *Second*, while the bankruptcy court *explicitly* found that Peter "show[ed] at least a willful disregard for his fiduciary duty" (*id.* at ECF 250), it made no such express finding as to Phillip. At best, this leaves unclear whether the bankruptcy court actually found willful blindness on Phillip's part. *Third,* the bankruptcy court went on to say as a result of "intentionally directing payments from draws" to the wrong parties, "both [defendants] *knowingly* violated the trust." (Appellant's App. (dkt. #2-1) ECF 249.) This finding of knowledge is at least arguably inconsistent with any implicit holding of willful blindness.

Even so, the record might permit such a finding, given the court's apparent finding that Phillip knew about construction liens; he knew KBI was building homes using money from construction draws; and he knew KBI was selling homes during the time period at issue. (*Id.* at ECF 168-69, 175, 187-88.) Moreover, Phillip admitted during his trial testimony that he never took *any* steps to ensure that subcontractors and suppliers on

13

particular houses were paid with the proceeds from the sales of those houses, despite knowing that KBI maintained just a single bank account from which all expenses were paid. (Appellant's App. (dkt. #2-1) ECF 172-73.)  Phillip further admitted that he received monthly financial statements from KBI, but apparently never reviewed them, relying entirely on Peter to handle the accounts payable.  (*Id.* at ECF 171.)  Finally, the bankruptcy court found disingenuous his testimony that he did not know of the theft-by-contractor statute and the duties it imposed -- a credibility finding the court has already concluded it cannot disturb clearly erroneous.  Together, this might provide a sufficient evidentiary basis for the bankruptcy court to find defalcation predicated on willful blindness, if not actual knowledge.  The court reserves on that question, however, since the bankruptcy court has either made no such findings or has failed to articulate good grounds for them.[6]

Thus, the court is left with two problems in this case: (1) an inadequate explanation as to the evidence the bankruptcy court relied on in explicitly finding Phillip's *knowing* misappropriations; and (2) no clear finding of willful blindness, if such a finding was made at all.  The bankruptcy court's finding of defalcation cannot stand without at least one of those two being present.  Given the somewhat murky nature of the bankruptcy court's factual findings, the court will, therefore, remand this case back to the bankruptcy court, which had the benefit of presiding over the trial, for further findings of fact.  In particular,

---

[6] Phillip also argues that the bankruptcy court violated his constitutional due process rights by basing its defalcation decision entirely on the underlying civil theft by contractor claim, lowering the requisite level of intent.  In light of the foregoing discussion and this court's remand order, this argument appears moot, since on remand the bankruptcy court is required to make explicit findings as to its reasons for finding Phillip acted with intent or willful blindness.  In any event, Phillip does not argue defalcation depends on a finding of common law fraud, and to the extent he does, the court notes that *Bullock* does not require proof of all five elements of fraud -- only that the conduct must involve "bad faith, moral turpitude, or other immoral conduct" *or* "an intentional wrong," with the latter encompassing a party's conscious disregard of a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty.  *See Bullock*, 133 S. Ct. at 1759-60.

the court remands for the bankruptcy court to: (1) point to the evidence on which it relied for its finding of knowing misconduct, and (2) make more express findings as to whether Phillip's actions or inactions constitute willful blindness.

ORDER

IT IS ORDERED that the judgment of the United States Bankruptcy Court for the Western District of Wisconsin is REMANDED for further factual findings consistent with this opinion.

Entered this 23rd day of September, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge