IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
───────────────────────────────────────────────────────────────

PHILLIP A. SVEUM and SUSAN S. SVEUM,

                Defendant-Appellants,        OPINION & ORDER

  v.

                                                                         13-cv-788-wmc

STOUGHTON LUMBER COMPANY,

                Plaintiff-Appellee.
───────────────────────────────────────────────────────────────

      Appellant Phillip A. Sveum was an officer and owner of Kegonsa Builders, Inc. ("KBI"), along with his brother, Peter Sveum.[1] The Sveums obtained supplies for KBI's home construction business from various subcontractors, including Stoughton Lumber Company. Rather than segregate a proportionate share of funds KBI received from construction draws to pay those subcontractors as required by both contract and statute, however, KBI instead deposited the funds into a general account to be used for operating expenses, payroll and other bills. In the late 2000s, KBI began to struggle to meet its obligations to its subcontractors, including Stoughton Lumber.

      Eventually, in the midst of litigation initiated by Stoughton Lumber to collect more than $500,000 owed by KBI, the Sveums filed for bankruptcy protection under Chapter 7 of the United States Bankruptcy Code in the Western District of Wisconsin. In response, Stoughton Lumber filed adversary complaints, arguing that KBI's debt was non-dischargeable in the Sveums' pending bankruptcy cases because it arose out of their fraud or defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4).

---

[1] For simplicity, the court will refer to the Sveums by their respective first names where necessary to distinguish between them in this opinion.

To establish that a debt is non-dischargeable under § 523(a)(4), a plaintiff must establish "(1) a trust existed; (2) the debtor was a fiduciary of the trust; and (3) the debtor committed 'fraud or defalcation . . . while acting as a fiduciary of the trust.'" *In re Polus*, 455 B.R. 705, 708 (Bankr. W.D. Wis. 2011) (quoting 11 U.S.C. § 523(a)(4)). Since Wisconsin's theft-by-contractor statute, Wis. Stat. § 779.02(5), establishes an express trust, and the Sveums, as officers of KBI, were fiduciaries of that trust, the "fraud or defalcation" element was the only element of § 523(a)(4) in dispute. *Id*. The bankruptcy court denied entry of summary judgment on that element to either side, holding a consolidated trial on August 1, 2013. At the trial's conclusion, the court ruled from the bench that Peter and Phillip Sveum both had committed defalcation by failing to segregate and pay Stoughton Lumber money they held in trust for it as a subcontractor.

Both the Sveums appealed to this court, arguing that the bankruptcy court lacked evidence to establish the intent or willful blindness required to find defalcation. After reviewing the bankruptcy court's ruling and the record below, this court affirmed the decision of the bankruptcy court with respect to Peter Sveum. *Sveum v. Stoughton Lumber Co.*, No. 13-cv-789-wmc, 2014 WL 4748555 (W.D. Wis. Sep. 23, 2014). That decision was affirmed on appeal by the Seventh Circuit on June 4, 2015. *Stoughton Lumber Co., Inc. v. Sveum*, 14-3339, 2015 WL 3500237 (7th Cir. 2015). However, this court remanded Phillip's case to the bankruptcy court to make additional findings of fact. (Sept. 23, 2014 Opinion & Order (dkt. #5) 15 [hereinafter "Opinion"].)

The bankruptcy court subsequently submitted additional findings in a memorandum on remand (dkt. #9), in response to which both parties have filed supplemental briefs. Having reviewed those materials, the court now holds that the bankruptcy court did not

2

clearly err in finding that Phillip's actions and inactions constitute defalcation. Accordingly, the court will affirm the decision of the bankruptcy court with respect to Phillip Sveum as well.

FACTS AND PROCEDURAL HISTORY

The court has already provided a detailed summary of the facts of this case in its original opinion and will not repeat that summary here. As general background, the court notes that Peter was President of KBI and handled its day-to-day operations, while Phillip did not participate directly in KBI's daily business operations despite having authority and control over KBI's funds. Peter also signed all construction draw requests. For his part, Phillip testified that he: (1) knew that KBI was submitting draw requests to build homes; (2) received monthly financial statements for KBI, but spent no time going over accounts payable; (3) depended entirely on Peter and KBI's accounting department to ensure that funds went to the proper subcontractors; and (4) took no steps to ensure KBI was complying with its fiduciary obligations.

In its original decision after trial, the bankruptcy court found that Phillip knew that draws under construction loans are to be held in trust by the recipient general contractor, a factual finding that this court deferred to in its previous opinion and continues to see no grounds to overturn now. (*See* Opinion at 10.) The bankruptcy court further found that both Peter and Phillip had "testified to intentionally directing payments from draws to pay other than the subs and material suppliers who contributed to the improvement of the property securing the loan on which the draw was made." (Appellant's App. (dkt. #2-1) ECF 249.) Next, that court found Peter had committed fraud by falsely representing on

3

seller's certificates that all subcontractors had been paid. (*Id.* at ECF 250.) Finally, the bankruptcy court found as a result of Peter's conduct that Phillip "was aware that the sales were being made, and that they could only be done by the fraud carried out by his brother" in violation of the trust KBI owed to its subcontractors. (*Id.*)

On appeal, this court noted that contrary to the bankruptcy court's finding, Phillip had *not* testified, at least expressly, that he intentionally directed payments from draws to parties other than the subcontractors who had contributed to that particular property. (Opinion at 11.) Furthermore, the court could find no evidence in the record that Phillip had known Peter was signing in bulk blank affidavits of compliance with all payment obligations to subcontractors. (*Id.* at 12.) Despite these observations, this court also noted that the record could support a finding that Phillip acted with willful blindness. Because it was unclear whether the bankruptcy court had actually made such a finding, the court remanded the case for further factual findings, asking in particular that the bankruptcy court:

> (1) point to the evidence on which it relied for its finding of knowing misconduct, and (2) make more express findings as to whether Phillip's actions or inactions constitute willful blindness.

(*Id.* at 13-15.)

Relying on the evidence already adduced at trial, including the conduct of the witnesses, the bankruptcy court found on remand that "Phillip's conduct demonstrated actual knowledge of wrongdoing or a conscious disregard for a substantial and unjustifiable risk that his conduct would violate a fiduciary duty." (Memorandum on Remand (dkt. #9) 5 [hereinafter "Memorandum"].) With respect to evidence of knowing misconduct in

particular, the bankruptcy court pointed first to Phillip's testimony that he had participated in making a decision not to pay Stoughton Lumber with money infused into KBI from the Sveums' other businesses. The bankruptcy court found Phillip's participation demonstrated knowledge that "KBI had more debts to subcontractors than money with which to pay them." (*Id.* at 5-6.) "Consequently," it found that "every time he received a commission from the sale of a home, Phillip was presumably alerted to the possibility and, in this case, the fact that all the subcontractors were not receiving full payment." (*Id.* at 6.) "To the extent he, or any of the businesses from which he received payment or profit, benefitted from a diversion of KBI receipts, he was aware of the defalcation." (*Id.*)

Even if Phillip was not actually aware of his brother's wrongdoing, the bankruptcy court expressly found on remand he had "consciously disregarded the substantial and unjustifiable risk that his conduct was violating his fiduciary duty," thereby meeting the standard of willful blindness articulated in the Supreme Court's decision in *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754 (2013). (Memorandum at 6.) In support, the bankruptcy court pointed first to Phillip's receipt of monthly financial statements, which "would have alerted him to the non-payment of subcontractors and the possibility of a violation of his fiduciary duty." (*Id.*) Second, it noted that Phillip had access to KBI's account but "simply trusted his brother to properly segregate the money." (*Id.*) Third, it pointed out that the financials of all the Sveums' businesses were tied together, as was their collective financial health, and yet their accountant reported to Phillip and Peter about every business they owned *except* KBI. (*Id.*) Accordingly, the court concluded that Phillip's claim that "he never thought to inquire into KBI's business practices, despite all the information available to him, demonstrates at least willful blindness." (*Id.*)

5

OPINION

"[A] bankruptcy court's determination of dischargeability is subject to a clearly erroneous standard of review." *In re Bonnett*, 895 F.2d 1155, 1157 (7th Cir. 1989); *see also Schlaack v. Bagley,* No. 14-CV-746-JPS, 2015 WL 631286, at *4 (E.D. Wis. Feb. 12, 2015) (reviewing bankruptcy court's determination of dischargeability for clear error); *In re DeLong*, 323 B.R. 239, 246 (W.D. Wis. 2005) (same). Under this standard, this court should not overturn the bankruptcy court simply because it may have decided the case differently. *In re Morris*, 223 F.3d 548, 553 (7th Cir. 2000) (quoting *Bonnett*, 895 F.2d at 1157). Thus, "[w]here there are two permissible views of the evidence, the [bankruptcy court's] choice between them cannot be clearly erroneous." *Id.* (alterations in original) (quoting *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 309 (7th Cir. 1988)). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)).

For reasons explained above and in this court's original opinion, therefore, all that remains to be decided is whether the bankruptcy court's finding on remand that Phillip committed defalcation was clearly erroneous. In 2013, the Supreme Court resolved a split in authority as to the proper standard for defalcation, holding that defalcation "requires an intentional wrong." *Bullock*, 133 S. Ct. at 1759. It "include[d] as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent." *Id.* "Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary 'consciously disregards' (or is

6

willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.* (quoting ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985)).

The court need not reach the question of whether Phillip actually knew that he was violating his fiduciary duties to supervise KBI's handling of construction draws for the benefit of subcontractors, because the bankruptcy court's finding that he was willfully blind to those duties is not clearly erroneous. As noted earlier, this court previously upheld the bankruptcy court's finding that Phillip knew of his fiduciary duties under the theft-by-contractor statute. (Opinion at 10.) Thus, Phillip knew KBI was obligated to hold funds in trust for Stoughton Lumber. He further knew that KBI did not segregate the funds it received in separate bank accounts despite regularly submitting draw requests to obtain funds to build homes between 2008 and 2011. (Appellant's App. (dkt. #2-1) ECF 167-68.) Phillip also knew that KBI was *actually* continuing to build and sell homes. Indeed, Phillip continued to receive broker fees for homes sold through Coldwell Banker Success, which was the listing broker and agent for all KBI spec homes. (*Id.* at ECF 153, 173-74.) More importantly, Phillip knew that KBI was not meeting its obligations to various creditors after 2008, including Stoughton Lumber. (*Id.* at ECF 157-58.) And he participated in the decision to direct funds infused into KBI elsewhere, which, while not itself a defalcation, certainly provides evidentiary support for the bankruptcy court's finding that he knew KBI was not paying all its debts to its subcontractors, again including Stoughton Lumber. (*Id.* at ECF 158.)

In light of all that Phillip knew, and all the information to which he had access, as well as the bankruptcy court's unique opportunity as the trier of fact to judge Phillip's credibility, that court was in the best position to judge whether he actually drew the final

inference -- that KBI was violating its fiduciary duties to its contractors. But again, this court need not reach that question. At a minimum, the bankruptcy court did not clearly err in concluding under these circumstances that Phillip's failure to make *any* inquiry into KBI's practices and to take *any* steps to ensure it was complying with its trust obligations constituted a conscious disregard of the substantial, unjustifiable likelihood that KBI was out of trust. In particular, Phillip knew that he was obligated as an officer of KBI to ensure segregation and eventual payment of construction draws held in trust for particular subcontractors, and he knew at least at the time Peter and he began infusing KBI with new money that some subcontractors had not yet been paid. In light of that knowledge, Phillip's failure to take *any* action to ensure that KBI was complying with its trust fund obligations is deeply troubling. The bankruptcy court did not, therefore, clearly err in concluding that Phillip's deliberately cultivated ignorance of his company's financial undertakings, despite being its Vice-President, involved "a *gross deviation* from the standard of conduct that a law-abiding person would observe in [his] situation." *Bullock*, 133 S. Ct. at 1760 (emphasis in original) (quoting Model Penal Code, *supra*, at § 2.02(2)(c), p. 226); *see also In re Yerges*, 512 B.R. 916, 923 (Bankr. W.D. Wis. 2014) (rejecting defendant's plea of "ignorance as an excuse" and finding defalcation where defendant failed to inquire into fiduciary responsibilities over the course of many years of business).

Beyond Phillip's general challenge to the evidentiary underpinnings for the bankruptcy court's finding of defalcation, Phillip attacks the bankruptcy court's decision on two additional grounds, which the court will address briefly, along with a third argument at which he hints with respect to the scope of the non-dischargeability determination. First, he argues that the bankruptcy court failed to account for the timing in this case -- and more

specifically, for the relatively short length of time that KBI failed to adhere to its fiduciary obligations. Phillip points out in particular that KBI operated without problems for nearly two decades, arguably justifying his assumption that KBI's accounting staff and Peter as President would properly handle all trust funds. However, this argument holds water only so long as there *were* no problems with KBI's finances. By the time Phillip joined his brother in funneling money into a struggling KBI, and in deciding where to direct past-due payments, Phillip knew that KBI *had* serious problems. Inexplicably, Phillip nevertheless failed to inquire further into KBI's practices with respect to funds held in trust or ensure compliance with its obligations going forward, even as he continued to collect broker's fees for the sale of additional KBI properties out of trust.

  Phillip also argues that while he was aware "that KBI had an inventory of homes and unpaid accounts payable, some of which were certainly related to those homes, he did not know the <u>specific</u> suppliers and contractors who were owed money or the status of payments on specific homes." (Appellants' Br. (dkt. #14) 13 (emphasis in original).) Even if Phillip did not *know* the specific suppliers who were owed money, however, the bankruptcy court found that he certainly knew that there was a substantial risk that KBI was breaching its fiduciary duties, and he failed to take any action to avert that risk. An argument that Phillip may not have known the *details* is in this context a red herring at best, particularly in light of his admission that he knew KBI had at least some unpaid accounts payable. Said another way, a debtor cannot escape a determination of nondischargeability by deliberately keeping himself in the dark as to the details of an apparent breach of fiduciary duty.

Finally, on page 15 of his post-remand briefing, Phillip appears to suggest that the bankruptcy court inappropriately excepted the full amount of the debt from discharge, even though much of that debt was incurred before many of the events that support the finding of willful blindness. The law requires that the debt excepted from discharge must be "created by fraud or defalcation." Here, Stoughton Lumber was owed about $500,000 *before* 2008, while the strongest evidence of Phillip's willful blindness occurred after that date -- for example, his knowledge that KBI was no longer meeting its obligations to creditors and his assistance in directing money to creditors other than Stoughton Lumber. Admittedly, Phillip failed to inquire into KBI's practices before then, and he always knew that KBI wasn't bothering to segregate funds into different bank accounts, but that sort of behavior alone may not be enough to rise to the level of recklessness that *Bullock* requires. On the other hand, Phillip never pressed this argument at the trial or in the first round of briefing, nor does he offer a different approach other than to reject the entire verdict. As a result, an argument to allocate Stoughton Lumber's debt between competing claimants comes too late, and it is too undeveloped, to warrant yet another remand to the bankruptcy court for further findings. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (undeveloped or unsupported arguments are considered waived); *Schreiner v. United Wis. Inc. Co.*, 626 F. Supp. 2d 892, 912 (W.D. Wis. 2009) (same).

ORDER

IT IS ORDERED that the decision of the bankruptcy court is AFFIRMED.

Entered this 7th day of July, 2015.

                BY THE COURT:

                /s/

                _____
                WILLIAM M. CONLEY
                District Judge